UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FEB -7 2014

RECEIVED

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FEB -7 2014

CLERK

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

MIDLAND COGENERATION )
VENTURE LIMITED PARTNERSHIP )
)
Petitioner, )
) **14-102C**
v. ) Case No. 14-_____
)
FEDERAL ENERGY REGULATORY )
COMMISSION )
)
Respondent. )

## PETITION FOR REVIEW

Pursuant to Section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b) (2013), Rule 15(a) of the Federal Rules of Appellate Procedure ("FRAP"), and D.C. Circuit Rule 15, Midland Cogeneration Venture Limited Partnership ("Midland") hereby petitions this Court for review of the following orders issued by the Federal Energy Regulatory Commission:

- Order Denying Rehearing and Granting Clarification, *Midwest Independent Transmission System Operator, Inc., Consumers Energy Co.*, and *Michigan Electric Transmission Co., LLC*, 146 FERC ¶ 61,008, Docket Nos. ER10-1814-002, ER10-2156-003, and EL11-2-001 (January 8, 2014);

- Order on Rehearing, *Midwest Independent Transmission System*

*Operator, Inc., and Consumers Energy Co.*, 138 FERC ¶ 61,204, Docket Nos. ER10-1814-001, ER10-2156-001, ER10-2156-002 (March 20, 2012).

- Order Granting in Part and Denying in Part Petition for Declaratory Order, *Mich. Elec. Transmission Co. LLC*, 138 FERC ¶ 61,202, Docket No. EL11-2-000 (March 20, 2012).

Copies of the orders are attached as Appendix A. Midland is moving to consolidate this Petition with a pending appeal in Case No. 12-1224, given the common parties and overlapping issues. Midland also is moving to lift the abeyance order previously entered by the Court in that proceeding.

Midland is a party of record to the foregoing FERC proceedings and is aggrieved by FERC's orders. Midland timely sought rehearing in the proceedings. Midland petitions for review on the grounds that FERC's orders below are arbitrary, capricious and contrary to law and FERC's prior orders, regulations, and policies. In accordance with FRAP 15(c), a list of the parties served with a copy of this Petition is attached hereto as Appendix B. The Corporate Disclosure Statement required by FRAP 26.1 and D.C. Circuit Rule 26.1 is attached hereto as Appendix C.

Respectfully submitted,

Gordon A. Coffee
Raymond B. Wuslich
Winston & Strawn LLP
1700 K Street, N.W.
Washington, D.C. 20006
Tel:  (202) 282-5000
Fax: (202) 282-5100
E-mail:  gcoffee@winston.com
rwuslich@winston.com

ATTORNEYS FOR
MIDLAND COGENERATION VENTURE
LIMITED PARTNERSHIP

Dated:  February 7, 2014

# APPENDIX A

## FERC ORDERS

146 FERC ¶ 61,008
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Cheryl A. LaFleur, Acting Chairman;
Philip D. Moeller, John R. Norris,
and Tony Clark.

| | |
|---|---|
| Midwest Independent Transmission System Operator, Inc. Consumers Energy Company | Docket Nos. ER10-1814-002 ER10-2156-003 (not consolidated) |
| Michigan Electric Transmission Company, LLC | EL11-2-001 |

ORDER DENYING REHEARING AND GRANTING CLARIFICATION

(Issued January 8, 2014)

1.     Midland Cogeneration Venture Limited Partnership (Midland) has requested rehearing and clarification of the Commission's March 20, 2012 order issued in Docket Nos. ER10-1814-001, ER10-2156-001, and ER10-2156-002.[1] In that order, the Commission denied the request by Consumers Energy Company (Consumers Energy) for rehearing of the order issued in these proceedings on September 17, 2010,[2] in which the Commission accepted a late-filed interconnection agreement, conditionally accepted a new generator interconnection agreement, and, as pertinent here, granted a request by Michigan Electric Transmission Company, LLC (Michigan Electric) for clarification of the Facilities Agreement Order.  Midland requests rehearing and further clarification of the Facilities Agreement Rehearing Order, stating that the Commission's clarification granted new relief to Michigan Electric, which newly aggrieves Midland.

---

[1] *Midwest Indep. Transmission Sys. Operator, Inc.*, 138 FERC ¶ 61,204 (2012) (Facilities Agreement Rehearing Order), *appeal filed sub nom. Midland Cogeneration Venture Ltd. P'ship v. FERC,* No. 12-1224 (D.C. Cir. filed May 18, 2012).

[2] *Midwest Indep. Transmission Sys. Operator, Inc.*, 132 FERC ¶ 61,241 (2010) (Facilities Agreement Order).

2.      Additionally, Midland requests rehearing of an order, also issued on March 20, 2012, in Docket No. EL11-2-000, in which the Commission granted in part and denied in part Michigan Electric's October 18, 2010 petition for declaratory order.[3] Michigan Electric had petitioned the Commission to determine the respective rights and obligations between itself and Midland under two agreements (as more fully described below) relating to the interconnection of Midland's cogeneration facility (Midland Plant), located in Midland, Michigan, to the grid.

3.      For the reasons discussed below, we deny Midland's request for rehearing of the Facilities Agreement Rehearing Order but grant its request for clarification. We also deny Midland's request for rehearing of the Declaratory Petition Order. The Facilities Agreement Rehearing Order and the Declaratory Petition Order are referred to together as the "March 20 Orders."[4]

I.      **Background**

   A.    **The Facilities and Agency Agreements**

4.      The March 20 Orders provide a fuller description of the background of these related proceedings and of the ongoing dispute between Midland and Michigan Electric. In summary, however, the dispute arises under a 1988 interconnection agreement (Facilities Agreement) governing the interconnection of the Midland Plant to the transmission facilities previously owned by Consumers Energy and, since 2001, by Michigan Electric.[5] Beginning in 2004, Midland refused to reimburse Michigan Electric

---

   [3] *Mich. Elec. Transmission Co. LLC*, 138 FERC ¶ 61,202 (2012) (Declaratory Petition Order).

   [4] In a third order, also issued on March 20, 2012, in Docket No. ER11-136-000, the Commission denied Midland's request for clarification, or, in the alternative, rehearing of the Commission's December 17, 2010 order that accepted a late-filed agency agreement between Consumers Energy and Michigan Electric (Agency Agreement). *See Mich. Elec. Transmission Co. LLC*, 133 FERC ¶ 61,238 (2010), *reh'g denied*, 138 FERC ¶ 61,203 (2012), *appeal filed sub nom. Midland Cogeneration Venture L'td. P'ship v. FERC*, No. 12-1224 (D.C. Cir. filed May 18, 2012).

   [5] The Midland Plant is a qualifying co-generation facility under section 3(18)(B) of the Federal Power Act (FPA), 16 U.S.C. § 796(18)(B) (2012). The Midland Plant provides steam and electric power to Dow Chemical Co. (Dow Chemical), and electric power to Consumers Energy. Midland also sells electric power to third parties. Until 2006, Midland was a limited partnership owned by Consumers Energy, Dow Chemical and their affiliates. Until 2001, Consumers Energy owned the bulk transmission system

(continued...)

for costs (including property taxes) incurred by Michigan Electric to operate and maintain the Midland Plant interconnection facilities (Midland Interconnection Facilities).[6]

5.    On July 8, 1988, Midland and Consumers Energy entered into the Facilities Agreement (subsequently amended on June 9, 2008, and May 28, 2009) to govern the construction, ownership, and operation of the Midland Interconnection Facilities.[7] During 2010, Midland, Michigan Electric, and Midwest Independent Transmission System Operator, Inc. (MISO)[8] discussed, without coming to agreement, amending the Facilities Agreement or replacing it with a new generator interconnection agreement, under MISO's tariff.[9]    MISO had determined that such amendment or replacement was necessary to accommodate Midland's desire to increase the generating capacity of the Midland Plant.    Consumers Energy did not file the Facilities Agreement with the Commission until August 6, 2010, in Docket No. ER10-2156-000, shortly after MISO filed, in Docket No. ER10-1814-000, a partially executed generator interconnection agreement (GIA) among itself, Midland, and Michigan Electric.    In filing the Facilities Agreement, Consumers Energy asked the Commission to accept it, effective 60 days after filing, and to find that it came under the Commission's jurisdiction on July 6, 2006, the date of the Commission's order granting Midland market-based rate authority for wholesale sales.[10]

---

to which the Midland Plant interconnects.    In 2001, Consumers Energy transferred its transmission assets to a predecessor of Michigan Electric.    In 2002, Michigan Electric became a stand-alone transmission company, owned by an entity unaffiliated with Consumers Energy.    In 2007, Michigan Electric was acquired by ITC Holdings Corp.

[6] Related Docket Nos. ER12-420-000 and ER12-420-001 concern cancellation of the Facilities Agreement.    *See Consumers Energy Co.*, 139 FERC ¶ 61,014 (2012), *order on reh'g,* 142 FERC ¶ 61,193 (2013) (Cancellation Rehearing Order).    In the Cancellation Rehearing Order, the Commission also set for hearing and settlement judge procedures, in Docket No. ER10-2156-002, issues relating to Consumers Energy's May 25, 2012 refund report filed in that proceeding.

[7] Consumers Energy, Tariff Filing, Docket No. ER10-2156-000, at Attachment A, "Facilities Agreement" (filed Aug. 6, 2010).

[8] Effective April 26, 2013, MISO changed its name from "Midwest Independent Transmission System Operator, Inc." to "Midcontinent Independent System Operator."

[9] MISO FERC Electric Tariff, Fourth Revised Vol. No. 1.

[10] *See Midland Cogeneration Venture Ltd. P'ship*, 116 FERC ¶ 61,011 (2006).

Docket Nos. ER10-1814-002, *et al.*                                    - 4 -

6.      In early 2001, in connection with the transfer of its transmission facilities to
Michigan Electric,[11] Consumers Energy sought Midland's consent to an assignment of
the Facilities Agreement to Michigan Electric, but Midland withheld consent to such
assignment.[12]  For this reason, Consumers Energy and Michigan Electric instead
executed, on April 1, 2001, the Agency Agreement, under which Consumers Energy
delegated to Michigan Electric, as its agent, certain of its transmission-related obligations
under the Facilities Agreement.  On October 18, 2010, Michigan Electric filed the
Agency Agreement, in Docket No. ER11-136-000, asking for an effective date of
December 17, 2010.  The Commission accepted the late-filed Agency Agreement,
effective as requested.[13]

7.      Until 2004, Midland paid, originally to Consumers Energy and later to Michigan
Electric, invoices submitted to Midland for interconnection service.  However, beginning
in 2004, Midland stopped paying any invoices submitted by Michigan Electric, although
Michigan Electric, as Consumers Energy's agent, continued to provide Midland with the
interconnection service required by the Facilities Agreement.

8.      On October 18, 2010, in Docket No. EL11-2-000, Michigan Electric petitioned the
Commission to find that Midland must reimburse Michigan Electric for the unpaid costs
that Michigan Electric incurred, plus interest, in operating and maintaining the Midland
Interconnection Facilities, as agent for Consumers Energy, pursuant to the Facilities
Agreement.  Michigan Electric also petitioned the Commission to find that the late filing
of the Facilities Agreement and Agency Agreement did not render these agreements null
and void, and that Michigan Electric's sole obligation resulting from the late filing of the
Agency Agreement was to make time-value refunds of the monthly agency fees that
Consumers Energy paid to Michigan Electric.[14]

---

[11] *See supra* note 4.

[12] Section 10 of the Facilities Agreement provides:  "This Agreement shall inure to
the benefit of and be binding upon the successors and assigns of the respective Parties
hereto.  This Agreement shall not be transferred or otherwise alienated without the other
Party's written consent, which consent shall not unreasonably be withheld."

[13] *See supra* note 4.

[14] *See* Declaratory Petition Order, 138 FERC ¶ 61,202 at PP 2, 12-14.  Michigan
Electric filed both the Agency Agreement and its petition for declaratory order on
October 18, 2010.

Docket Nos. ER10-1814-002, *et al.*                                     - 5 -

### B.    The Facilities Agreement Order

9.      In the Facilities Agreement Order, the Commission accepted the late-filed
Facilities Agreement, effective October 5, 2010, and also conditionally accepted the
partially executed GIA, subject to the amendment or termination of the Facilities
Agreement.[15]  Midland intervened in both proceedings and protested both filings.

10.     In Docket No. ER10-1814-000, Midland argued that the Commission should not
condition its approval of the GIA on termination or amendment of the Facilities
Agreement.  Rather, Midland argued, the GIA should permit Midland to continue certain
provisions of the Facilities Agreement, and Midland should not have to choose between
all the provisions of one agreement or the other agreement.[16]  More specifically, Midland
protested its obligation under the GIA to pay for new meters, and Michigan Electric's
refusal to guarantee that Midland could supply increased power into the grid at existing
meters without additional charge.  Midland also protested the GIA's conditions for
reactive power supply.[17]  Lastly, Midland stated that it had never consented to the
Agency Agreement or to assignment by Consumers Energy to Michigan Electric of any
of its obligations under the Facilities Agreement.[18]

11.     In Docket No. ER10-2156-000, Midland argued that the Facilities Agreement
came under the Commission's jurisdiction when it was entered into, in 1988, and not
in 2006, as Consumers Energy argued, when Midland was granted market-based rate
authority.  Midland urged the Commission to accept the Facilities Agreement only to the
extent that it does not relate to interconnection service, and only with prospective effect.
Midland added that the Agency Agreement should have been filed with the Commission,
and characterized the Agency Agreement as an attempt by Consumers Energy and
Michigan Electric to circumvent the anti-assignment provision contained in section 10 of
the Facilities Agreement.[19]

---

[15] *See supra* note 2.

[16] Midland Aug. 9, 2010 Intervention and Protest at 7-9.

[17] *Id.* at 9-14.

[18] *Id.* at 14.

[19] *See supra* note 12.  Midland Aug. 27, 2010 Intervention and Comments at 11-13
(citing, in support of a prospective effective date, *Prior Notice and Filing Requirements
Under Part II of the Federal Power Act*, 64 FERC ¶ 61,139, *order on reh'g*, 65 FERC
¶ 61,108 (1993) (*Prior Notice Order*)).

Docket Nos. ER10-1814-002, *et al.*                                                    - 6 -

12.     In the Facilities Agreement Order, the Commission determined that its jurisdiction over the Facilities Agreement arose when Midland was first authorized, by contract or otherwise, to make sales to third parties, i.e., entities other than Consumers Energy and Dow Chemical.  Since the existing power purchase agreement between Midland and Consumers Energy, as originally executed in 1986, gave Midland the right to make third-party sales of residual capacity and energy, the Commission found that the Facilities Agreement became jurisdictional at the time of its execution, in 1988.  Accordingly, the Commission directed Consumers Energy to refund to Midland the time-value of revenues collected by Consumers Energy (or Michigan Electric as its agent) under the Facilities Agreement for the entire period during which revenues were collected without Commission approval, i.e., from the date the Facilities Agreement came under the Commission's jurisdiction until the effective date of Commission acceptance of the Facilities Agreement.[20]

13.     The Commission also held that increased generation required a new interconnection agreement and new meters, and that Midland could choose between continuing its existing generating capacity with existing meters under the Facilities Agreement or increasing the generating capacity of the Midland Plant and installing new meters in accordance with the new GIA.  The Commission also approved the reactive power requirements of the GIA.  Lastly, the Commission held that any new interconnection agreement would be governed by the provisions of MISO's *pro forma* generator interconnection agreement.[21]

## II.     The March 20 Orders

### A.     The Facilities Agreement Rehearing Order

14.     Consumers Energy requested rehearing of the Facilities Agreement Order, and Michigan Electric requested clarification or, in the alternative, rehearing of the Facilities Agreement Order.[22]  Consumers Energy argued that the Facilities Agreement became

---

[20] Facilities Agreement Order, 132 FERC ¶ 61,241 at PP 24-26.

[21] *Id.* PP 34-36, 43-44, 50.

[22] Although Midland did not request rehearing or clarification of the Facilities Agreement Order, it filed an answer to Michigan Electric's request for rehearing, to which Michigan Electric filed an answer.  Midland filed a reply to Michigan Electric's answer.  The Commission rejected all three pleadings as prohibited answers to requests for rehearing.  Facilities Agreement Rehearing Order, 138 FERC ¶ 61,204 at P 23 (citing Rule 713(b) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.713(b) (2011)).

subject to the Commission's jurisdiction, with accompanying refund liability, only upon occurrence, other than isolated instances, of actual sales to third-party utilities at a given time, quantity, and price, not upon permission to make FERC-jurisdictional transactions under future contingent events,[23] an argument that the Commission rejected.[24]  However, relying on the *Prior Notice Order* and discussion in *El Paso Electric Co.*, the Commission granted the clarification, requested by Michigan Electric, that acceptance of the late-filed Facilities Agreement with an effective date of October 5, 2010, and the late-filed Agency Agreement, with an effective date of December 17, 2010, does not affect the validity and enforceability of these agreements during the period of non-filing, and that nothing in the Facilities Agreement Order was intended to modify the Commission's precedent regarding time-value refunds.[25]

15.     Additionally, the Commission observed that the Agency Agreement obligates Consumers Energy and Michigan Electric to cooperate with one another in the preparation of invoices for the operation and maintenance services described in the Facilities Agreement, and that the December 16, 2010 refund report that Consumers Energy had filed, in Docket No. ER10-2156-002, did not include any amounts billed by Michigan Electric in its capacity as Consumers Energy's agent.  Therefore, the Commission ordered Consumers Energy to file a revised refund report that itemizes all amounts billed to Midland by both Consumers Energy and Michigan Electric, and also the amounts that Midland has paid and the amounts billed to Midland that remain unpaid.[26]

---

[23] Consumers Energy Oct. 18, 2010 Request for Rehearing at 2-3.

[24] Facilities Agreement Rehearing Order, 138 FERC ¶ 61,204 at P 25.  The Commission relied on *Western Mass. Elec. Co.*, 59 FERC ¶ 61,091, *reh'g denied*, 61 FERC ¶ 61,182 (1992), *aff'd sub nom. Western Mass. Elec. Co. v. FERC,* 165 F.3d 922 (D.C. Cir. 1999), and *Fla. Power & Light Co.*, 133 FERC ¶ 61,121 (2010).

[25] Facilities Agreement Rehearing Order, 138 FERC ¶ 61,204 at PP 26-28.  The Commission relied on the *Prior Notice Order, supra* note 19, and *El Paso Elec. Co.*, 105 FERC ¶ 61,131, at PP 13-15, 18 (2003) (*El Paso*).

[26] *Id.* PP 31-32.  Consumers Energy submitted the required revised refund report on April 19, 2012, later corrected on May 26, 2012 (May 26, 2012 Refund Report).  Midland, which had earlier settled its differences with Consumers Energy over the amount to be refunded to it, protested these refund reports.  On March 21, 2013, the Commission set the May 26, 2012 Refund Report for hearing and settlement judge procedures to determine the time-value refunds that Consumers Energy owes to Midland and other matters.  Cancellation Rehearing Order, 142 FERC ¶ 61,193 at PP 37-38.  *See*

(continued…)

Docket Nos. ER10-1814-002, *et al.*                                                                 - 8 -

### B.     Declaratory Petition Order

16.     In the Declaratory Petition Order, the Commission concluded that Consumers
Energy was entitled to recover, during the entire period that the Facilities Agreement was
jurisdictional, the rates authorized in the Facilities Agreement.  It concluded, reciprocally,
that, for this entire period, Midland was obligated to reimburse Consumers Energy for the
costs (including property taxes) properly incurred under the Facilities Agreement.
However, noting that Michigan Electric was not a party to the Facilities Agreement, the
Commission concluded that there was no contractual basis to order Midland to pay
Michigan Electric directly for the unreimbursed costs incurred by Michigan Electric.[27]
Accordingly, the Commission denied the specific relief requested by Michigan Electric.

## III.    Midland's Rehearing/Clarification Requests

17.     Midland contends, in the instant request for rehearing and clarification of the
Facilities Agreement Rehearing Order, that the Commission granted new relief when it
clarified that the Facilities Agreement was enforceable prior to its October 5, 2010
effective date.  Therefore, in Midland's view, rehearing of the Facilities Agreement
Rehearing Order is appropriate.  On rehearing, Midland lists four grounds for error,
which we discuss below.  In its request for rehearing of the Declaratory Petition Order, in
Docket No. EL11-2-001, Midland makes essentially the same four arguments.  In
addition, in its request for rehearing of the Facilities Agreement Rehearing Order,
Midland requests clarification on the issue of Michigan Electric's claim for
reimbursement of property taxes.  As explained below, we will deny rehearing, but will
grant clarification.

### A.     Effective Date and Enforceable Date

18.     Midland contends that the Commission erred when it found that the Facilities
Agreement and the Agency Agreement were effective prior to their filing.  Midland

---

*supra* note 6.  On September 20, 2013, the Settlement Judge reported that the parties had
reached an impasse.  On September 25, 2013, the Chief Administrative Law Judge
appointed a presiding administrative law judge and, in Docket No. ER10-2156-004,
established a procedural schedule for the hearing previously ordered by the Commission.

[27] Declaratory Petition Order, 138 FERC ¶ 61,202 at PP 20-22.  The
Commission's further conclusions found unpersuasive Midland's additional arguments
about why it should not be required to pay the rates authorized by the Facilities
Agreement for the service it took under that agreement and observed that Midland had
failed to seek rehearing of the Facilities Agreement Order.  *Id.* PP 23-25.

Docket Nos. ER10-1814-002, *et al.*                                            - 9 -

argues that the Commission violated the FPA and Commission regulations by allowing an unfiled agreement to be enforceable from inception, without a showing of "extraordinary circumstances" or a finding of good cause.[28] In this regard, Midland notes that section 205(d) of the FPA[29] provides that the Commission may, for good cause shown, allow tariff changes to take effect without requiring sixty days' notice. Midland also relies on section 35.11 of the Commission's rules and regulations, "Waiver of notice requirement,"[30] which provides that the Commission "may, by order, provide that a rate schedule, tariff, or service agreement, or part thereof, shall be effective as of the date of filing . . . ." Midland argues that Consumers Energy did not request waiver when it filed the Facilities Agreement.

19.     We find that Midland has confused the effective date for Commission acceptance of a rate filing with the enforceable date of a jurisdictional agreement. The effective date is the date, under FPA section 205 and the Commission's regulations, that the Commission accepts the rate filing and thus makes it "effective." As relevant here, it establishes the ending date for time-value refunds ordered due to the late filing of a jurisdictional agreement.[31] The Commission's establishing such an effective date is *not* a finding, however, that, prior to this date, the rate filing was not just and reasonable. In contrast, the enforceable date of a jurisdictional agreement is simply the date that the parties to such an agreement agree to perform their identified obligations to each other.

20.     In granting Michigan Electric's request for clarification – i.e., concluding that the late filing of the Facilities Agreement and the Agency Agreement did not affect the validity and enforceability of these agreements before they were filed, and that nothing in the Facilities Agreement Rehearing Order modified the Commission's precedent regarding the limitations on time-value refunds – the Commission hewed to its long

---

[28] Facilities Agreement Rehearing Order Rehearing Request at 4-9; Petition Order Rehearing Request at 4-9.

[29] 16 U.S.C. § 824d (2012).

[30] 18 C.F.R. § 35.11 (2013).

[31] Waiver of the Commission's prior notice and filing requirements so as to receive an effective date prior to the date otherwise established by FPA section 205 and the Commission's regulations, which has the effect of shortening the period of time-value refunds, requires the filing entity to show good cause for its untimely filing before the Commission will grant an early effective date.

Docket Nos. ER10-1814-002, *et al.*                                   - 10 -

standing precedent. The Commission referred to the *Prior Notice Order*[32] and *El Paso*,[33] which held that the approach proposed by Midland could be unjust if it gives no substantive effect to late-filed agreements prior to the effective date established by the Commission in the order accepting the filing, which would follow 60 days from the date a rate is filed.[34] The Commission stated that its policy is to encourage compliance with the prior notice and filing requirements while still ensuring that a utility may collect bargained-for rates, even prior to the filing of those rates, when the utility has, in fact, rendered service. Therefore, the Commission held that Consumers Energy is entitled to collect the rates authorized by the Facilities Agreement for the entire period that the Facilities Agreement was jurisdictional, and that the Commission saw no provision in the Facilities Agreement that permits Midland to simply stop paying the contractual rate contained in the Facilities Agreement, especially where, as here, Midland has neither asserted non-performance under the Facilities Agreement by Consumers Energy nor refused to accept performance by Consumers Energy's agent, Michigan Electric. The Commission thus appropriately ordered Midland to pay the charges provided for in the Facilities Agreement, which the Commission had determined, in the Facilities Agreement Order, to be just and reasonable.[35]

21.     Midland argues that the Commission's reliance, in the March 20 Orders,[36] on *El Paso* and the *Prior Notice Order* is misplaced because "nothing in the cited paragraph of [*El Paso*] or the cited pages from the *Prior Notice Order* stands for "the proposition that the rates in a late-filed agreement are 'collectible' regardless of the effective date of the filing."[37]

22.     As explained plainly, in PP 27-28 of the Facilities Agreement Rehearing Order, however, and as the Commission also indicated in the *Prior Notice Order*, to give no effect to late-filed agreements prior to the Commission-established effective date could

---

[32] *See supra* note 19.

[33] *See supra* note 25.

[34] The Commission referred also to its precedent that time-value refunds are not without limit, and that a utility is permitted to recover its variable costs.

[35] Facilities Agreement Rehearing Order, 138 FERC ¶ 61,204 at PP 27-30.

[36] Facilities Agreement Rehearing Order, 138 FERC ¶ 61,204 at PP 27-28; Declaratory Petition Order, 138 FERC ¶ 61,202 at PP 22-23.

[37] Facilities Agreement Rehearing Order Rehearing Request at 4.

Docket Nos. ER10-1814-002, *et al.*                                    - 11 -

be unjust, and the Commission's policy, rather, is to encourage compliance with the prior notice and filing requirements while still ensuring that a utility is not treated unjustly when it files an otherwise just and reasonable rate belatedly after service has commenced. In such cases, the Commission will require the utility to refund the time value of the revenues collected, but the rate is nevertheless collectible.[38] The Commission followed this policy in the Facilities Agreement Order in which it accepted the Facilities Agreement, but also ordered Consumers Energy to refund to Midland the time-value of the rates that had been collected under the Facilities Agreement.

### B.   Consistency with Recent Decisions

23.    Midland argues that the Commission's holdings in the March 20 Orders are inconsistent with the position that the Commission has taken in other cases in which, according to Midland, the Commission has held that an agreement was not enforceable absent waiver of the prior notice requirement.[39]  In support of this argument, Midland cites the Commission's brief in *Xcel Energy Services, Inc. v. FERC*, 510 F.3d 314 (D.C. Cir. 2007) (*Xcel*).[40]  In that case, Xcel Energy Services, Inc. (Xcel) filed four interconnection agreements several years after commencement of service and asked the Commission to grant waiver of the prior notice and filing requirements of the FPA, so as to set effective dates for acceptance of the agreements four to five years prior to their

---

[38] Facilities Agreement Rehearing Order, 138 FERC ¶ 61,204 at PP 27-28; 8 n.17 (in the *Prior Notice Order*, 64 FERC ¶ 61,139 at 61,979, "the Commission stated that if a utility files an otherwise just and reasonable cost-based rate after new service has commenced, the Commission requires the utility to refund to its customers the time value of the revenues collected, calculated pursuant to section 35.19a of the Commission's regulations").

[39] Facilities Agreement Rehearing Order Rehearing Request at 10-13; Petition Order Rehearing Request at 9-13.

[40] Commission precedent, we caution, is established in Commission-issued orders. *See, e.g., Indianapolis Power & Light Co.*, 48 FERC ¶ 61,040, at 61,203 ("The Commission speaks through its orders."), *order on reh'g*, 48 FERC ¶ 61,328 (1989); *cf. N.C. Utilities Comm'n v. FERC*, 42 F.3d 659 (D.C. Cir. 1994) ("[T]his court cannot accept appellate counsel's post hoc rationalization of an agency decision. The Commission's decision 'must be upheld. . . on the basis articulated by the agency.'" (citations omitted)); 18 C.F.R. § 388.104 (2013) (providing that, in the normal course of Commission operations, "[o]pinions expressed by the staff do not represent the official views of the Commission").

Docket Nos. ER10-1814-002, *et al.*                                   - 12 -

filing.[41]  Midland also cites *BP West Coast Products, LLC v. FERC*, 374 F.3d. 1263 (D.C. Cir. 2004) (*BP*), which concerns shippers' challenges to oil pipeline rates under the Energy Policy Act of 1992.[42]

24.      Neither of the cited cases is on point.  The issue in *Xcel* was whether contracts under which Xcel had never charged the otherwise agreed-upon rates for interconnection services (because of lengthy, related proceedings) should receive backdated effective dates, and whether the required showing of good cause was satisfied by the fact that Xcel had not yet invoiced its customers for the interconnection services that it had provided for several years.  The issue in *BP*, under a very different statute and regulatory regime, was whether revisions to oil pipeline rates were new rates and as a result ineligible for grandfathering under EPAct 1992.  In contrast, the issue in the instant proceedings is not whether the effective dates for acceptance of the Facilities and Agency Agreements were correct or whether the Commission should have waived its prior notice and filing requirements.  Rather, the issue in the instant proceedings is whether the Commission erred in finding that the two late-filed agreements were enforceable as of the dates of their execution.  Moreover, the instant proceedings are further distinguished from *Xcel*, in particular, by the fact that Consumers Energy, and later, Michigan Electric, had invoiced Midland for the services rendered under the Facilities Agreement, and that Midland for a period of several years paid those invoices.

### C.     Midland's Reimbursement Obligation

25.      Midland characterizes the Commission's holding that Midland is obligated to pay Consumers Energy the amount incurred by Michigan Electric under the Facilities Agreement as "an attempt to sidestep the lack of contract privity" between Midland and Michigan Electric, and as arbitrary and capricious because Consumers Energy incurred no costs and made no demand for payment of costs incurred by Michigan Electric.

---

[41] The court, we note, upheld the Commission, finding that the Commission was within its discretion in deciding not to waive the prior notice requirement where Xcel

filed the interconnection agreements more than four years after the effective dates agreed to by the customers and failed to show extraordinary circumstances warranting waiver.

[42] Pub. L. No. 102-486, 106 Stat. 2776, *codified at* 42 U.S.C. §§ 1320-556 (2012) (EPAct 1992).

Midland adds that Michigan Electric, as an agent, has no standing, under Michigan law, to make demands that its principal, Consumers Energy, has not chosen to assert.[43]

26.     Again, we see no need to further explain the Commission's reasoning in the Facilities Agreement Rehearing Order.[44]  As we noted in that order, the Facilities Agreement provides reciprocal duties of providing interconnection services and then paying for those interconnection services, and names Consumers Energy as the provider to be paid by Midland.  Not claiming non-performance, Midland has no valid reason to withhold payment for services rendered and received under the Facilities Agreement, a jurisdictional agreement that the Commission has since accepted.

## D.     Waiver of Anti-Assignment Clause

27.     Midland states that the Commission erred in making an "implicit finding" that Midland waived the protection of the anti-assignment clause in section 10 of the Facilities Agreement against unilateral assignment of the Facilities Agreement by Midland's not suing Consumers Energy and by Midland's not unilaterally disconnecting the Midland Plant from the grid.[45]  Midland further argues that Consumers Energy's attempt to delegate its rights and duties under the Facilities Agreement to Michigan Electric represented a violation of section 10, contrary to Michigan law.

28.     Midland's premise is incorrect.  Neither in the March 20 Orders, nor in the underlying Facilities Agreement Order, nor in the orders in the Docket No. ER11-136 proceedings (accepting the Agency Agreement and denying rehearing) did the Commission find that Midland waived its right to withhold written consent to assignment of the Facilities Agreement.  Rather, the Commission merely determined that, under the Facilities Agreement, Midland was entitled to service from Consumers Energy, and Midland indeed received service from Consumers Energy.  Thus, Midland was and is

---

[43] Facilities Agreement Rehearing Order Rehearing Request at 15-17; Petition Order Rehearing Request at 14-16.

[44] Facilities Agreement Rehearing Order, 138 FERC ¶ 61,204 at PP 30-31.

[45] *See supra* note 12.  Clarification Order Rehearing at 16-17; Petition Order Rehearing Request at 16-18.

Docket Nos. ER10-1814-002, *et al.*                                             - 14 -

obligated to pay for that service.[46]  In fact, in the recital clauses to the Agency
Agreement, Consumers Energy acknowledges its ongoing transmission-related
obligations to Midland under the Facilities Agreement.[47]  Also, we note that the Facilities
Agreement appears to expressly contemplate that Consumers Energy may engage agents
to assist in performing its obligations.[48]

###### E.    Clarification

29.    Lastly, Midland cites footnote 50 of the Facilities Agreement Rehearing Order, in
which the Commission, refers to a Midland objection in its protests to Michigan
Electric's petition for declaratory order (Docket No. EL11-2-000) and to Consumers
Energy's refund report (Docket No. ER10-2156-002), and states:

> Midland argues that personal property taxes assessed on the interconnection
> facilities are a fixed, not variable, cost and are therefore not recoverable
> under the Commission's time value refund policy.  On October 28, 2011,
> Consumers Energy filed a refund report indicating that it has agreed to pay
> Midland $250,000 in settlement of their dispute over the amount refunded,
> *without resolving any of the underlying issues* (emphasis added). [49]

30.    Midland states that that settlement did not involve Michigan Electric and so did
not resolve the dispute.  Midland argues that no evidence in the record supports a finding
that that settlement was intended to resolve the refund issue relating to Michigan

---

[46] In the Facilities Agreement Rehearing Order, 138 FERC ¶ 61,204, at P 30, the
Commission stated explicitly that it was Consumers Energy that was "entitled to collect
the rates authorized by the Facilities Agreement, and the Commission similarly explicitly
referred to the fact that Midland "has not asserted non-performance . . . by Consumers
Energy."

[47] In the Facilities Agreement Rehearing Order, 138 FERC ¶ 61,204 at P 31, the
Commission referenced the operation and maintenance services provided by Consumers
Energy under the Facilities Agreement and stated its expectation that the parties would
comply with their respective obligations under the agreement.

[48] Section 4 of the Facilities Agreement, "Access," provides that "Consumers, *its
agents* and employees, shall have full right and authority of ingress and egress at all
reasonable times on and across the premises of [Midland] for the purpose of installing,
operating, maintaining and removing the Connection Facilities." [Emphasis added.]

[49] Facilities Agreement Rehearing Order, 138 FERC ¶ 61,204 at P 32 n.50.

Docket Nos. ER10-1814-002, *et al.*                                    - 15 -

Electric's claims. Midland asks the Commission to clarify that footnote 50 did not resolve the fixed cost issues as it relates to Michigan Electric, and that the settlement between Consumers Energy and Midland did not reach the issue of fixed costs and variable costs between Midland and Michigan Electric. Midland also asks that the Commission address Michigan Electric's right, or lack thereof, to recover fixed costs after Consumers Energy submits a revised refund report, as instructed by the Commission.[50]

31.     The Commission did not decide, in that footnote 50, quoted above, that the settlement between Midland and Consumers Energy resolved Midland's issue of whether property taxes on the Midland Interconnection Facilities are fixed or variable costs. What time-value refunds, if any, are owing to Midland for revenues collected under the Facilities Agreement is an issue in the currently on-going hearing.[51]

The Commission orders:

(A)     Midland's request for rehearing of the Facilities Agreement Rehearing Order and the Declaratory Petition Order is hereby denied, as discussed in the body of this order.

(B)     Midland's request for clarification of the Facilities Agreement Rehearing Order is hereby granted, as discussed in the body of this order.

By the Commission.

( S E A L )

Nathaniel J. Davis, Sr.,
Deputy Secretary.

---

[50] Facilities Agreement Rehearing Order Rehearing Request at 18-19.

[51] *See supra* note 26. On November 12, 2013, the Presiding Administrative Law Judge issued an order clarifying the issues set for hearing by the Cancellation Rehearing Order, *supra* note 6. *Consumers Energy Co.*, Docket No. ER10-2156-004 (Nov. 12, 2013) (unpublished presiding officer order).

138 FERC ¶ 61,204
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Jon Wellinghoff, Chairman;
         Philip D. Moeller, John R. Norris,
         and Cheryl A. LaFleur.

| | |
|---|---|
| Midwest Independent Transmission System Operator, Inc. | Docket No.  ER10-1814-001 |
| Consumers Energy Company | Docket Nos.  ER10-2156-001 ER10-2156-002 |
| | (not consolidated) |

ORDER ON REHEARING

(Issued March 20, 2012)

1.  On September 17, 2010, the Commission, in Docket No. ER10-2156-000, accepted a late-filed facilities agreement (Facilities Agreement) between Consumers Energy Company (Consumers Energy) and Midland Cogeneration Venture Limited Partnership (Midland).  The Facilities Agreement, dated July 8, 1988 and amended on May 28, 2009, governs the interconnection of Midland's cogeneration facility (Midland Plant) to the transmission grid formerly owned by Consumers Energy and now owned by Michigan Electric Transmission Company, LLC (Michigan Electric).[1]  The Commission accepted the Facilities Agreement effective October 5, 2010.  The Commission also conditionally accepted, in Docket No. ER10-1814-000, a partially executed generator interconnection agreement (GIA) among Midwest Independent Transmission System Operator, Inc., Midland, and Michigan Electric, which, subject to amendment or termination of the Facilities Agreement, would replace the Facilities Agreement.[2]

---

[1] *Midwest Indep. Transmission Sys. Operator, Inc.*, 132 FERC ¶ 61,241 (2010) (September 17 Order).

[2] The new GIA would permit Midland to increase capacity at and sales of electric energy from the Midland Plant.  Midland did not execute the new GIA because, among other things, it objected to the provision of the new GIA requiring either amendment or

(continued...)

Docket No. ER10-1814-001, *et al.*                                      - 2 -

2.      Consumers Energy has requested rehearing of the September 17 Order. Michigan Electric filed a request for clarification or, in the alternative, rehearing of the September 17 Order. For the reasons discussed below, we are denying the requests for rehearing and granting the clarification requested by Michigan Electric.

I.      **Background**

3.      The Midland Plant is a 1,566.2 megawatt (MW) net capacity gas-fired combined cycle cogeneration facility located in Midland, Michigan that, over the course of its operating history, has been certified by the Commission, and has self-certified, as a Qualifying Facility (QF),[3] pursuant to section 201 of the Public Utility Regulatory Policies Act of 1978 (PURPA).[4] The Midland Plant was interconnected to Consumer Energy's system in the late 1980s and was placed in commercial operation in 1990. Midland and Consumers Energy entered into a power purchase agreement (Power Purchase Agreement) on July 17, 1986, pursuant to which Midland sells capacity and energy to Consumers Energy.[5] The Power Purchase Agreement was amended and restated most recently on June 9, 2008. The Facilities Agreement sets forth the terms of the interconnection of the Midland Plant to Consumers Energy's transmission system. The Facilities Agreement also describes the facilities required to complete the interconnection, allocates to the parties responsibility for the cost of those facilities, and provides for the conveyance of ownership of certain facilities provided by Midland to

---

termination of the Facilities Agreement. The September 17 Order conditionally accepted the new GIA and required certain minor revisions. It left to Midland the decision whether to increase the Midland Plant's capacity, so that the new GIA, not the Facilities Agreement, governs interconnection terms and conditions, or to retain the Midland Plant's existing capacity and the terms and conditions of the Facilities Agreement. September 17 Order, 132 FERC ¶ 61,241 at PP 34-35. In a June 9, 2011, filing in Docket No. ER11-3764-000, MISO filed a revised GIA, which the Commission accepted on July 20, 2011, under delegated authority, subject to termination or amendment of the Facilities Agreement. On November 15, 2011, Consumers Energy filed a Notice of Cancellation of the Facilities Agreement in Docket No. ER12-420-000. That filing is pending.

[3] The Commission initially certified the Midland Plant as a qualifying cogeneration facility in Docket No. QF87-237-000 on March 12, 1987. *CMS Midland, Inc.*, 38 FERC ¶ 61,244 (1987).

[4] 16 U.S.C. § 796 (2006).

[5] Midland also has contractual arrangements for the sale of steam and electric capacity and energy to an on-site customer, Dow Chemical Company (Dow Chemical). Those arrangements are not subject to any dispute in these proceedings.

Consumers Energy. In addition, section 3.1 of the Facilities Agreement obligates Consumers Energy to operate and maintain the interconnection facilities and obligates Midland to reimburse Consumers Energy for all direct and indirect costs and expenses (including property taxes) incurred by Consumers Energy in owning and operating the interconnection facilities.

4.     In 2001, Consumers Energy transferred all of its transmission facilities, including the interconnection facilities that are the subject of the Facilities Agreement, to a predecessor of Michigan Electric, which was then a subsidiary of Consumers Energy.[6] As part of that transaction, Consumers Energy and Michigan Electric entered into an agency agreement (Agency Agreement) pursuant to which Consumers Energy delegated to Michigan Electric, as its agent, operating authority with respect to the transferred interconnection facilities.[7] Until 2004, in accordance with section 10 of the Facilities Agreement, Midland reimbursed Consumers Energy, and then Michigan Electric, for the costs incurred by those companies in operating and owning the interconnection facilities. Since 2004, however, Midland has not paid the amounts invoiced by Michigan Electric for the operations and maintenance (O&M) services provided for in the Facilities Agreement.

5.     As discussed more fully below, QF interconnection agreements, such as the Facilities Agreement, are not jurisdictional if the entire output of the QF must be sold to the directly interconnected utility (or to an on-site customer).[8] However, at some point –

_____

[6] Subsequently, in 2002, Michigan Electric was transferred to an unaffiliated entity. *See Trans-Elect, Inc.* 98 FERC ¶ 61,142 (2002).

[7] In the September 17 Order, 132 FERC ¶ 61,241 at P 27, the Commission clarified that Consumer Energy's filing of the Facilities Agreement did not relieve Michigan Electric of its responsibility to file the Agency Agreement. Subsequently, Michigan Electric filed the Agency Agreement with the Commission in Docket No. ER11-136-000. Midland protested the Agency Agreement arguing that the rates contained in the Facilities Agreement are not just and reasonable. The Commission accepted the Agency Agreement, finding that the rates contained in the Facilities Agreement were not at issue in Docket No. ER11-136-000. *Mich. Elec. Transmission Co.*, 133 FERC ¶ 61,238 (2010) (Agency Agreement Order). Midland has sought rehearing of the Agency Agreement Order. The Commission is addressing the rehearing of the Agency Agreement Order in an order issued concurrently with this order. *Mich. Elec. Transmission Co.*, 138 FERC ¶ 61,203 (2012).

[8] The Commission's PURPA regulations provide for QFs to bear interconnection costs that are subject to state jurisdiction. 18 C.F.R. § 292.306 (2011). When the Commission initially adopted its PURPA regulations, most QFs could sell only to the

(continued...)

that point being the central issue in Consumer Energy's rehearing request – the Midland/Consumers Energy interconnection became jurisdictional. In its filing in Docket No. ER10-2156-000, Consumers Energy conceded that the interconnection facilities became jurisdictional in 2006, some four years before the Facilities Agreement was filed. In the September 17 Order, however, the Commission determined that the Facilities Agreement was jurisdictional when it was executed in 1988 since the related Power Purchase Agreement gave Midland the right to make third-party sales under certain circumstances.

6.      In the September 17 Order, the Commission reviewed its policy concerning when it exercises jurisdiction over interconnection agreements that connect QFs to the grid. Citing Order No. 2003,[9] *Western Massachusetts Electric Company,*[10] and *Niagara Mohawk Power Corporation,*[11] the Commission stated that its jurisdiction over a QF's interconnection to a transmission system starts when the QF's owner first obtains the right to sell any of the QF's output to a third party (other than to an on-site customer).[12] An agreement releasing the interconnecting utility from its obligation to purchase the QF's full output establishes the right to sell output to a third party.[13]

7.      Based on these precedents, the Commission determined that its jurisdiction over the Facilities Agreement arose when Midland was first authorized, by contract or otherwise, to make sales to entities other than Consumers Energy or Dow Chemical. Specifically, because the original Power Purchase Agreement, which antedates the

---

directly interconnected utility; the Commission's PURPA regulations accordingly governed most QF interconnections.

[9] *Standardization of Generator Interconnection Agreements and Procedures,* Order No. 2003, FERC Stats. & Regs. ¶ 31,146 (2003), *order on reh'g,* Order No. 2003-A, FERC Stats. & Regs. ¶ 31,160, *order on reh'g,* Order No. 2003-B, FERC Stats. & Regs. ¶ 31,171 (2004), *order on reh'g,* Order No. 2003-C, FERC Stats. & Regs. ¶ 31,190 (2005), *aff'd sub nom. Nat'l Ass'n of Regulatory Util. Comm'rs v. FERC,* 475 F.3d 1277 (D.C. Cir. 2007).

[10] 61 FERC ¶ 61,182 (1992) (*Western Massachusetts*), *aff'd sub nom. Western Massachusetts Elec. Co. v. FERC,* 165 F.3d 922 (D.C. Cir. 1999) (*WMECO v. FERC*).

[11] 121 FERC ¶ 61,183 (2007), *reh'g denied,* 123 FERC ¶ 61,061 (2008) (*Niagara Mohawk*).

[12] September 17 Order, 132 FERC ¶ 61,241 at P 24-26.

[13] *Id.* P 25 & n. 34 (citing *Niagara Mohawk,* 121 FERC ¶ 61,183).

Docket No. ER10-1814-001, *et al.*                                    - 5 -

Facilities Agreement, gave Midland the right to make sales of residual capacity and energy (that is, the portion of the Midland Plant's output not committed to Consumers Energy under the Power Purchase Agreement) to third parties, the Commission found that the Facilities Agreement became jurisdictional at the time of execution in 1988. The Commission ordered Consumers Energy to refund the time value of revenues collected under the Facilities Agreement for the entire period during which it collected revenues without Commission approval.[14]

## II.    **Consumers Energy's Rehearing Request**

### A.    **Commission Jurisdiction over Facilities Agreement**

8.    On rehearing, Consumers Energy argues that the Commission erroneously held that the Facilities Agreement became jurisdictional at the time of its execution. Consumers Energy also argues that the Commission's imposition of time-value refunds is inconsistent with Commission precedent. Consumers Energy urges that the earliest the Facilities Agreement could have come under the Commission's jurisdiction was 1998, when the open access provisions of Order No. 888[15] enabled Midland to start making sales to third-party purchasers.[16] Accordingly, Consumers Energy asserts that the

---

[14] *Id.* P 26. On December 16, 2010, Consumers Energy submitted a refund report in Docket No. ER10-2156-002, concluding that it owed no time-value refunds. Midland filed a protest of the December 16, 2010 refund report. On October 28, 2011, Consumers Energy filed a revised refund report indicating its agreement to pay $250,000 to Midland in settlement of all disputed amounts under the Facilities Agreement, and, on November 2, 2011, Midland withdrew its protest. As discussed below, since the information in the two refund reports appears to be incomplete, we are directing Consumers Energy to file a further revised refund report within 30 days of the date of this order that itemizes all amounts billed to Midland by Consumers Energy (or by Michigan Electric as its agent) under the Facilities Agreement, the amounts that have been paid by Midland, and the amounts billed to Midland that remain unpaid.

[15] *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, FERC Stats. & Regs. ¶ 31,036 (1996), *order on reh'g*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048, *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

[16] In this regard, Consumers Energy refers to documentation filed by Midland of sales of 200 MWH and 30 MWH, on May 29, 1998, to Engage Energy U.S., LP.

(continued...)

Docket No. ER10-1814-001, *et al.* - 6 -

Commission should not have found the Facilities Agreement to be jurisdictional before the date that Midland began making actual third-party sales in 1998, and that the Commission erred in concluding otherwise based on orders issued after 1998 in which it clarified its policy concerning its jurisdiction over QF interconnection agreements.

9. More particularly, Consumers Energy maintains that the Commission erred in finding that the original Power Purchase Agreement between Midland and Consumers Energy authorized Midland to make third-party sales, given that section 3(c) of the original Power Purchase Agreement gave Consumers Energy the right of first refusal to purchase any residual capacity and energy from the Midland Plant.[17] In this regard, Consumers Energy states that it never waived its right of first refusal, even when Midland's residual capacity and energy was unneeded for Consumers Energy's own load. Instead, according to Consumers Energy, it always bought and then resold any unneeded residual capacity and energy under a "buy-sell" arrangement that the Commission

---

Midland, Motion to Intervene and Comments, Ex. J, Docket No. ER10-2156-000 (filed Aug. 27, 2010).

[17] Section 3(c) of the original (1986) Power Purchase Agreement, Attachment A to Consumers Energy's Rehearing Request, provided, until amendment in 1989:

> Consumers shall have the right of first refusal with respect to the purchase of any part or all of such Residual Capacity and Energy. Prior to Seller [i.e., Midland] committing to sell any part or all of such Residual Capacity and Energy to any other electric utility, Seller shall offer to Consumers the right to purchase such Residual Capacity and Energy on the same terms and conditions as are available to Seller. . . . If Consumers decides not to purchase part or all of any Residual Capacity and Energy available, the Seller shall be free to sell such part or all . . . to another electric utility. At the request of such utility, Consumers shall assist in the delivery of Residual Capacity and Energy upon terms and condition customary for similar transactions by Consumers for other utilities.

Residual Capacity and Energy was defined as: "Available Capacity and its associated energy at the MC-Facility in excess of the Contract Capacity and its associated energy."

Docket No. ER10-1814-001, *et al.*                                    - 7 -

recognized, in a 1991 order, was not grounds for denying recertification of the Midland Plant as a QF.[18]

10.      Moreover, although Consumers Energy acknowledges that Amendment No. 3 of the Power Purchase Agreement, dated August 28, 1989, gives Midland a contractual right to make limited third-party sales,[19] that right could not effectively be exercised prior to Order No. 888, which was issued in 1996, since sales from the Midland Plant to third parties requires transmission across the American Electric Power and the Northern Indiana Public Service Company systems, and this transmission service was not available to Midland prior to Order No. 888.[20]  Thus, prior to Order No. 888, Midland sold residual energy not needed by Consumers Energy by using the buy-sell arrangement previously reviewed by the Commission.[21]

11.      Consumers Energy also argues that, prior to 1998, when Midland first made third-party wholesale sales, there was no Commission precedent to support the Commission's conclusion that the Facilities Agreement was jurisdictional from its date of execution in 1988.[22]  In this regard, Consumers Energy points out that, in 1988, the Commission had not yet stated that the mere ability to make third-party wholesale sales triggered jurisdiction over a QF's interconnection agreement.  Only the 1992 *Western Massachusetts* order, which was upheld on appeal in 1999, antedates Midland's 1998 third-party wholesale sales.  Order No. 2003 was issued in 2003, five years after

---

[18] Consumers Energy Rehearing Request at 6 (citing *Midland Cogeneration Venture Ltd. P'ship.*, 56 FERC ¶ 61,361, at 62,397 (1991)).

[19] Amendment No. 3 of the Power Purchase Agreement modified Consumer Energy's first right of refusal to purchase residual power as follows:  "This Agreement does not obligate Seller to sell or Consumers to purchase, any capacity or energy other than Commercial Energy, and Seller shall have the right, other than with respect to Commercial Energy, to sell any and all capacity and energy that might be available from the MC-Facility to any third party or into any market."  Commercial Energy is defined as:  "The maximum amount of electric energy determined hourly which could be generated by the lower of Contract Capacity and Available Capacity, whether delivered or not."

[20] Consumers Energy Rehearing Request at 7-8.

[21] *Id.* at 7.  Consumers Energy states that it had established a generally available, buy-resale service in Docket No. ER92-198-000.  *Consumers Power Co.*, 58 FERC ¶ 61,323, *order on clarification,* 59 FERC ¶ 61,276 (1992).

[22] *Id.* at 8.

Docket No. ER10-1814-001, *et al.*                                    - 8 -

Midland's first third-party wholesale sales, and the Commission decided *Niagara Mohawk* nearly a decade after the first third-party sales.

12.     Furthermore, Consumers Energy argues that *Western Massachusetts* is distinguishable, in that it involved interconnection agreements established for the express purpose of facilitating third-party sales. The holding in *Western Massachusetts*, therefore, should not be applied to a QF owner (such as Midland) that merely had the potential right to make third-party wholesale sales, especially where, as already noted, Consumers Energy had the right of first refusal to purchase any residual capacity and energy.

13.     Similarly, Consumers Energy points out that, in Order No. 2003, the Commission focused only on actual wholesale sales as the jurisdictional trigger over third-party QF sales.[23] Thus, Consumers Energy argues that Order No. 2003 does not give clear notice that a QF's theoretical ability to make third-party wholesale sales would make interconnection agreements, such as the Facilities Agreement, jurisdictional. Finally, although recognizing that, in the *Niagara Mohawk* orders issued in 2007, the Commission found jurisdiction over a QF's interconnection even before the start of third-party, wholesale sales, by that time, according to Consumers Energy, Midland had already been making actual third-party sales for nine years. Consumers Energy concludes, therefore, that those orders could not have played any role in establishing when the Facilities Agreement became jurisdictional.[24]

     **B.     Time-Value Refunds**

14.     Consumers Energy urges that the Commission erred in applying its *Niagara Mohawk* policy retroactively to require time-value refunds for the entire period that the Facilities Agreement has been in effect. Consumers Energy argues that, prior to *Niagara Mohawk*, the Commission exercised jurisdiction over QF interconnection agreements only when a QF made actual wholesale sales to third parties. Consumers Energy argues that only after the issuance of *Niagara Mohawk* in 2007 was the industry on notice that a QF's mere ability to make wholesale sales, before the start of actual sales, triggered

---

[23] *Id.* at 10-11 (citing Order No. 2003, FERC Stats. & Regs. ¶ 31,146 at P 813-14).

[24] *Id.* at 12.

Docket No. ER10-1814-001, *et al.*                                                      - 9 -

Commission jurisdiction.[25]  Accordingly, the Commission should apply the "ability to sell" standard only prospectively and not prior to its announcement in 2007.[26]

15.      To apply the "ability to sell" standard before issuance of *Niagara Mohawk*, according to Consumers Energy, is retroactive application of a new policy.  Consumers Energy cites the Commission's three-prong test for deciding whether to apply a new policy retroactively:

> (1) whether the rule is actually a departure from clear prior policy or instead a new policy for a new situation (or a clarification of a prior policy); (2) whether retroactive application will be more likely to hinder than to further the operation of the new rule; and (3) whether retroactive application would produce substantial inequitable results, with particular reference to whether parties relied on the old standard.[27]

16.      Consumers Energy further argues that *Niagara Mohawk* was wrongly decided in that it purports to expand the Commission's jurisdiction beyond the limits of the Federal Power Act (FPA).[28]  Section 205 of the FPA requires public utilities to file all contracts that in any manner affect or relate to rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices and services affecting such rates and charges.[29]  The statute does not require public utilities to file any agreement that may facilitate a potential Commission-jurisdictional sale or service at some unknown future date.  The statute instead requires public utilities to file contracts 60 days before engaging in Commission-jurisdictional sales and permits the Commission to waive the 60-day notice requirement for good cause.[30]  Under the FPA, the Commission's jurisdiction to require utilities to file contracts or unilateral rates for

---

[25] *Id.*

[26] *Id.* at 13-14.  Consumers Energy also states that the Commission should be "judicious in applying the actual sales jurisdictional standard approved in *WMECO v. FERC*, in 1999, and generically stated in Order No. 2003 to sales made before then."

[27] *Id.* at 14-15 (citing *Southern Co. Energy Mktg., LP*, 86 FERC ¶ 61,131, at 61,457-58 (1999)).

[28] 16 U.S.C. § 791a *et seq.* (2006).

[29] 16 U.S.C. § 824d(c) (2006).

[30] 16 U.S.C. § 824d(d) (2006).

Docket No. ER10-1814-001, *et al.*                                        - 10 -

wholesale sales of energy or capacity or transmission of energy in interstate commerce is not triggered by the mere possibility of a jurisdictional transaction. In this case, even the possibility that Midland might have engaged in a jurisdictional transaction with a third party was completely within Consumers Energy's control, under the original Power Purchase Agreement, because of its right of first refusal.

17.     In any event, even if the Commission's holding in *Niagara Mohawk* were found to be consistent with the FPA, retroactive application of *Niagara Mohawk* would violate the fair notice doctrine[31] and the Due Process Clause, according to Consumers Energy, since Consumers Energy would be required to pay refunds relating to a period before it could reasonably have been expected to have known that the Facilities Agreement was jurisdictional. Consumers Energy states that it is not alone in objecting that, in *Niagara Mohawk*, the Commission retroactively expanded its jurisdiction over a narrow category of interconnection agreements years, and even decades, after those agreements were executed.[32] In this connection, Consumers Energy states that it was first alerted to the new jurisdictional rule announced in *Niagara Mohawk* when Florida Power & Light Company, concerned by the potential consequences of *Niagara Mohawk* on its own QF interconnection agreements, filed a petition for a declaratory order, in Docket No. EL10-43-000, requesting the Commission either to reverse its new jurisdictional policy or at least clarify that it would be applied only on a prospective basis.[33]

18.     Consumers Energy concludes its arguments by stating that the "ability to sell" doctrine of *Niagara Mohawk* creates uncertainty as to when and whether to file interconnection agreements, and that the retroactive award of substantial time-value refunds in this case is inequitable and may result in confiscatory rates.[34]

———————————

[31] Under the fair notice doctrine, "application of a rule may be successfully challenged if it does not give fair warning that the allegedly violative conduct was prohibited." *United States. v. Chrysler Corp.*, 158 F.3d 1350, 1355 (D.C. Cir. 1998).

[32] Consumers Energy Rehearing Request at 17.

[33] In *Florida Power & Light Co.*, 133 FERC ¶ 61,121, at P 21 (2010) (*Florida Power*), (discussing *Western Massachusetts*, Order No. 2003, and *Niagara Mohawk*), the Commission denied the petition, stating that "if a QF avails itself of its PURPA privileges, . . . Commission jurisdiction will attach (thereby requiring that the interconnection agreement be filed) as soon as and only if the QF is provided with an express right to sell output to third parties rather than on the date that sales to third parties occur."

[34] Consumers Energy Rehearing Request at 17-18.

Docket No. ER10-1814-001, *et al.*                                                  - 11 -

### III.   Michigan Electric's Request for Rehearing

19.    In its request for rehearing, Michigan Electric asks the Commission to clarify that failure to file the Facilities and Agency Agreements with the Commission in timely fashion does not affect the validity and enforceability of these agreements during the period before they were filed, and that the September 17 Order does not establish or suggest that these agreements were invalid or unenforceable prior to the effective date of their acceptance for filing by the Commission.[35]

20.    Michigan Electric also asks the Commission to clarify that the September 17 Order was not intended to modify the Commission's policy regarding late-filed agreements and to confirm that time-value refunds will not be assessed if the result is that the utility will have operated at a loss.[36]

21.    To the extent that the Commission does not clarify the September 17 Order, as requested, Michigan Electric seeks rehearing.

### IV.   Additional Pleadings

22.    On November 2, 2010, Midland filed an answer to Michigan Electric's request for rehearing. On November 17, 2010, Michigan Electric filed an answer to Midland's answer. On December 2, 2010, Midland filed a reply to Michigan Electric's answer.

### V.   Discussion

#### A.   Procedural Matters

23.    Rule 713(d) of the Commission's Rules of Practice and Procedure[37] prohibits an answer to a request for rehearing. Accordingly, we will reject Midland's answer to Michigan Electric's request for rehearing, as well as the subsequent answers filed in this proceeding, i.e., Michigan Electric's answer to Midland's answer to the request for rehearing, and Midland's reply to Michigan Electric's answer.

---

[35] Michigan Electric Rehearing Request at 3-7.

[36] *Id.* at 7-8. Michigan Electric cites *Carolina Power & Light Co.*, 84 FERC ¶ 61,103, at 61,522 (1998), *order on reh'g*, 87 FERC ¶ 61,083, at 61,357 (1999) (*Carolina Power*).

[37] 18 C.F.R. § 385.713(d) (2011).

Docket No. ER10-1814-001, *et al.*                                        - 12 -

## B.    Substantive Matters

24.    The requests for rehearing raise the following issues: (1) at what point did the Facilities Agreement first become subject to Commission jurisdiction; (2) what is the effect of the late-filing of the Facilities Agreement on Consumers Energy's right to collect the rates provided for in the Facilities Agreement; and (3) what are the rates that Consumers Energy, and Michigan Electric, as Consumers Energy's agent, may recover, under the Facilities Agreement, and how are time-value refunds calculated.

### 1.    Commission Jurisdiction over the Facilities Agreement

25.    In the *Prior Notice Order*,[38] the Commission reviewed its earlier decision in *Western Massachusetts*, in which it had addressed the boundary between state and federal jurisdiction over agreements pursuant to which QFs interconnect with the grid. The Commission noted that, in *Western Massachusetts*, it held that the states have exclusive jurisdiction over direct interconnections between a QF and the public utility that purchases the QF's power, and that, conversely, the Commission alone exercises authority over QF interconnections with utilities standing between the QF and its purchaser. The Commission declined to reconsider that holding and leave the issue of QF interconnections entirely to the states, or to apply the ruling in *Western Massachusetts* prospectively, as several commenters had requested. Finding no reason to overturn its precedent, the Commission noted that it had always had jurisdiction over interconnections that permit third-party sales.[39] The Commission concluded that "even if the QF or the utility customer does not actually take transmission service as soon as the line enters the grid, the interconnection agreement 'facilitates' future service and falls within our section 205 jurisdiction."[40] In light of the foregoing, we reject Consumers Energy's argument that, prior to *Niagara Mohawk*, Commission precedent was not clear that QF interconnections that may facilitate future service were subject to the Commission's jurisdiction. Moreover, as noted, the Commission, in the *Prior Notice Order,* already has rejected requests that the *Western Massachusetts* ruling should be

---

[38] *Prior Notice and Filing Requirements Under Part II of the Federal Power Act*, 64 FERC ¶ 61,139, *order on reh'g*, 65 FERC ¶ 61,081 (1993) (*Prior Notice Order*).

[39] Consumers Energy's reliance upon the Commission's recognition of the "buy-sell" arrangement under the Power Purchase Agreement in *Midland Cogeneration Venture Ltd. P'ship*, 56 FERC ¶ 61,361, supra n.18, is misplaced. That case did not concern the jurisdictional status of the Facilities Agreement. Rather, at issue in that case was whether the "buy-sell" arrangement between Midland and Consumers Energy was grounds for denying recertification of the Midland Plant as a QF.

[40] *Prior Notice Order,* 64 FERC at 61,991-92.

applied only prospectively. Accordingly, as decided previously, and as recently confirmed in *Florida Power*,[41] (discussing *Western Massachusetts,* Order No. 2003, and *Niagara Mohawk*), we deny Consumers Energy's request that the Commission apply its policy on jurisdiction over QF interconnections prospectively from the Commission's 2007 *Niagara Mohawk* decision.

### 2.  The Effect of the Late-Filing of the Facilities and Agency Agreements on the Right to Collect the Rates Provided for in those Agreements

26.     Michigan Electric requests the Commission to clarify that its acceptance of the late-filed Facilities Agreement, with an effective date of October 5, 2010, and the late-filed Agency Agreement, with an effective date of December 17, 2010, does not affect the validity and enforceability of those agreements during the period of non-filing, and that nothing in the September 17 Order was intended to modify the Commission's precedent regarding time-value refunds. We grant Michigan Electric's requested clarifications.

27.     The Commission has recognized that assuring compliance with the prior notice and filing requirements of section 205 of the FPA[42] and the Commission's implementing regulations, 18 C.F.R. Part 35 (2011), pursuant to which public utilities must file rates and charges for jurisdictional service, and all contracts and agreements relating to such service, at least 60 days in advance of the commencement of jurisdictional service, is an important goal.[43] The Commission has also recognized that a policy that gives no effect to late-filed agreements prior to the stated effective date of the order accepting the filing, which, without a waiver of the 60-day prior notice requirement, would follow 60 days from the date a rate was filed, could be unjust.[44] The Commission thus has developed a policy that both encourages compliance with the prior notice and filing requirements while still ensuring that a utility may collect bargained-for rates prior to the filing of those rates.

28.     In the *Prior Notice Order*, the Commission stated that, if a utility files an otherwise just and reasonable rate after new service has commenced, the rate is

---

[41] *Florida Power*, 133 FERC ¶ 61,121 at P 19-20.

[42] 16 U.S.C. § 824d (2006).

[43] *El Paso Elec. Co.,* 105 FERC ¶ 61,131, at P 13-15, 18 (2003) (*El Paso*).

[44] *Id.* at P 19; *cf. Morgan Stanley Capital Group, Inc. v. Pub. Util. Dist. No. 1 of Snohomish County, Washington*, 554 U.S. 527, 545 (2008) (*Morgan Stanley*).

Docket No. ER10-1814-001, *et al.*                                         - 14 -

collectible, but the Commission will require the utility to refund the time value of the revenues collected for the entire period that the rate was collected without Commission authorization.[45] Thus, as the rate is collectible, the Commission will grant the requested clarification.

29.     However, that the Commission has also provided for refund of the time value of revenues collected pursuant to a late-filed agreement does not mean there is no limit to time-value refunds to be ordered pursuant to the policy announced in the *Prior Notice Order*. The Commission, recognizing that refunds will result in a harsh result if payment of such refunds would result in a loss, has limited time value refunds to an amount that will permit a utility to recover variable costs.[46] This matter is addressed below.

### 3.     Recoverable Rates and Refunds

30.     Based on the refund policy announced in the *Prior Notice Order* and as implemented in subsequent orders, Consumers Energy is entitled to collect the rates authorized by the Facilities Agreement for the entire period that the Facilities Agreement was jurisdictional. Midland, in fact, paid the rate, as originally billed by Consumers Energy, and later by Michigan Electric, as agent, until November 2004. Midland then stopped paying the contractual rate. We see no provision in the Facilities Agreement that permits Midland to simply stop paying the contractual rate contained in the Facilities Agreement, especially where, as here, Midland has not asserted non-performance under the Facilities Agreement by Consumers Energy or refused to accept performance by Consumers Energy's agent, Michigan Electric.[47] We will accordingly order Midland to pay the charges provided for in the Facilities Agreement, which, in the Facilities Agreement Order, we have already determined to be a just and reasonable rate.

---

[45] *Prior Notice Order,* 64 FERC at 61,979-80.

[46] *See Carolina Power,,* 84 FERC ¶ 61,103, at 61,522 (1998), *order on reh'g,* 87 FERC ¶ 61,083, at 61,357 (1999); *El Paso* 105 FERC ¶ 61,131, at P 41 & n.59; *Florida Power & Light Co.,* 98 FERC ¶ 61,276, at 62,150-51 (2002); *Florida Power & Light Co.,* 133 FERC ¶ 61,120, at P 5 (2010); *Florida Power.,* 133 FERC ¶ 61,121 at P 23 n.39

[47] *Morgan Stanley*, 554 U.S. at 551 (The FPA recognizes that contract stability ultimately benefits consumers . . . which is why it permits rates to be set by contract and not just by tariff.); *Permian Basin Are Rate Cases,* 390 U.S. 747, 822 (1968) ("The regulatory system created by the [FPA] is premised on contractual agreements voluntarily devised by the regulated companies; it contemplates abrogation of these agreements only in circumstances of unequivocal necessity.").

31.     Section 3.6 of the Facilities Agreement sets forth the terms of invoicing and payment of invoices for the O&M services provided by Consumers Energy, and section 8 (which incorporates by reference a provision in the Power Purchase Agreement) governs the resolution of disputes under the Facilities Agreement.  While not expressly stated, we assume that this would include resolution of any dispute over amounts invoiced.  In turn, section 4 of the Agency Agreement obligates Consumers Energy and Michigan Electric to cooperate with one another in the preparation of invoices for the O&M services.  We expect the parties to comply with their respective obligations under these agreements.

32.     As noted above,[48] in accordance with the September 17 Order, Consumers Energy filed on December 16, 2010, in Docket No. ER10-2156-002, a refund report disclosing the amounts collected under the Facilities Agreement from when Consumers Energy first received revenues under the Facilities Agreement.[49]  In that filing, Consumers Energy asserted that it does not have any obligation to pay refunds since the amounts collected simply reimbursed Consumers Energy for actual costs (including property taxes) incurred to construct, operate and maintain the interconnection facilities.[50]  However, on preliminary review of that report, it does not appear that the amounts shown on the attached schedule include any of the amounts billed after 2004 by Michigan Electric in its capacity as Consumers Energy's agent, which remain unpaid.  Also, it is unclear whether the amounts billed between 2001 (the year in which the interconnection facilities were conveyed to Michigan Electric) and 2004 (the year in which Midland stopped making payments) include only the costs incurred directly by Consumers Energy (for which full payment was made) or include, as well, costs incurred by Michigan Electric, in its capacity as Consumers Energy's agent.  Accordingly, we direct Consumers Energy to file a revised refund report within 30 days of the date of this order that itemizes all amounts billed to Midland by Consumers Energy (or by Michigan Electric as its agent) under the Facilities Agreement, the amounts that have been paid by Midland, and the amounts billed to Midland that remain unpaid.

---

[48] *Supra* note 14.

[49] September 17 Order, 132 FERC ¶ 61,241 at P 26, Ordering Paragraph (C).

[50] We note that, in its protest to Michigan Electric's request for declaratory order in Docket No. EL11-2-000, as well as in its protest, filed on January 6, 2011, to Consumers Energy's refund report in Docket No. ER10-2156-002, Midland argues that personal property taxes assessed on the interconnection facilities are a fixed, not variable, cost and are therefore not recoverable under the Commission's time value refund policy.  On October 28, 2011, Consumers Energy filed a revised refund report indicating that it has agreed to pay Midland $250,000 in settlement of their dispute over the amount refunded, without resolving any of the underlying issues.

Docket No. ER10-1814-001, *et al.* - 16 -

The Commission orders:

    (A)    The requests for rehearing filed by Consumers Energy and Michigan Electric in this proceeding are hereby denied as discussed in the body of this order.

    (B)    The requests for clarification by Michigan Electric are hereby granted, as discussed in the body of this order.

    (C)    Consumers Energy is hereby directed to file a revised report showing all amounts collected (including amounts collected by Michigan Electric as its agent) under the Facilities Agreement within 30 days of the date of this order that itemizes all amounts billed to Midland by Consumers Energy (or by Michigan Electric as its agent) under the Facilities Agreement, the amounts that have been paid by Midland, and the amounts billed to Midland that remain unpaid.

By the Commission.

( S E A L )

                                                           Nathaniel J. Davis, Sr.,
                                                            Deputy Secretary.

138 FERC 61,202
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Jon Wellinghoff, Chairman;
Philip D. Moeller, John R. Norris,
and Cheryl A. LaFleur.

Michigan Electric Transmission                    Docket No. EL11-2-000
Company, LLC

ORDER GRANTING IN PART AND DENYING IN PART
PETITION FOR DECLARATORY ORDER

(Issued March 20, 2012)

1.       On October 18, 2010, Michigan Electric Transmission Company, LLC (Michigan Electric) petitioned the Commission (Petition), under Rule 207 of the Commission's Rules and Regulations,[1] for a declaratory order to determine the respective rights and obligations of Michigan Electric and Midland Cogeneration Venture Limited Partnership (Midland) under two late-filed jurisdictional agreements.  The two agreements are:  (1) a 1988 interconnection agreement (Facilities Agreement)[2] between Consumers Energy Company (Consumers Energy) and Midland, pursuant to which Consumers Energy agreed to construct, own and operate certain interconnection facilities required to connect Midland's cogeneration power plant (Midland Plant) to the grid; and (2) a 2001 agency agreement (Agency Agreement)[3] between Consumers Energy, as principal, and Michigan

_____

[1] 18 C.F.R. § 385.207 (2011).

[2] *See Midwest Indep. Transmission Sys. Operator, Inc.*, 132 FERC ¶ 61,241 (2010) (Facilities Agreement Order).  On October 18, 2010, Michigan Electric and Consumers Energy each filed a request for rehearing (Docket Nos. ER10-18145-001 and ER10-2156-001).  Our order on rehearing of the Facilities Agreement Order is being issued concurrently with this order.  *Midwest Indep. Transmission Sys. Operator, Inc.*, 138 FERC ¶ 61,203 (2012) (Facilities Agreement Rehearing Order).

[3] *See Michigan Elec. Transmission Co., LLC,* 133 FERC ¶ 61,238 (2010) (Agency Agreement Order).  Our order on rehearing of the Agency Agreement Order is being issued concurrently with this order.  *Michigan Elec. Transmission Co.*, 138 FERC ¶ 61,203 (2012) (Agency Agreement Rehearing Order).

Electric, as agent, pursuant to which Consumers Energy delegated to Michigan Electric certain of its operating responsibilities under the Facilities Agreement.[4]  As described below, Michigan Electric and Midland are currently involved in litigation in the United States District Court for the Eastern District of Michigan (District Court) involving disputed issues under the Agency Agreement and Facilities Agreement.

2.       In the Petition, Michigan Electric asks the Commission to:  (1) determine the rights and obligations of the parties to the Agency Agreement and Facilities Agreement, or, if the Commission declines to do so, at least provide the District Court with guidance regarding certain issues regarding the rights and obligations of the parties under these agreements; (2) find that Midland owes Michigan Electric $1,703,886.78 as reimbursement for costs (including property taxes) incurred by Michigan Electric in operating and maintaining the interconnection facilities that are subject to the Facilities Agreement, plus interest for past due amounts as calculated under the Facilities Agreement; and (3) find that the delay in filing the Facilities Agreement and Agency Agreement does not render those agreements null and void.[5]

3.       As explained below, in the Facilities Agreement Order and Agency Agreement Order, the Commission has already addressed the rate issues raised by the filing of the Facilities Agreement and the Agency Agreement.  To the extent that there are other issues, the Commission is addressing those issues here.

**I.       Background**

4.       Midland[6] owns a 1,566.2 megawatt (MW) net capacity gas-fired cogeneration facility (Midland Plant) located in Midland, Michigan, that has been Commission-certified and self-certified as a Qualifying Facility (QF) since 1987.[7]  Consumers Energy

---

[4] The Facilities Agreement and Agency Agreement were attached to the Petition as Attachment A and Attachment B, respectively.

[5] Petition at 16.

[6] Midland, a limited partnership, was originally owned by Consumers Energy and Dow Chemical Company (Dow Chemical) and their affiliates.  Since 2009, Midland has been owned by EQT Infrastructure, a Swedish private equity firm, and Fortistar, a United States energy investment group.  *See Midland Cogeneration Venture Ltd. Partnership*, 127 FERC ¶ 62,045 (2009).

[7] The Commission initially certified the Midland Plant as a qualifying cogeneration facility in Docket No. QF87-237-000 on March 12, 1987.  *See CMS Midland, Inc.*, 38 FERC ¶ 61,244 (1987).

Docket No. EL11-2-000                                                        - 3 -

purchases substantially all of the electric capacity and energy from the Midland Plant pursuant to a July 17, 1986 Power Purchase Agreement (Power Purchase Agreement), as it has been amended. The Facilities Agreement, which was entered into on July 8, 1988,[8] describes the interconnection facilities that Midland and Consumers Energy agreed to construct in order to connect the Midland Plant to the transmission grid formerly owned by Consumers Energy, as well as to Dow Chemical, the steam host. As relevant to the dispute in this case, the Facilities Agreement provides for Midland to reimburse Consumers Energy for the latter's actual costs (including property taxes) in owning, operating and maintaining certain of the interconnection facilities.[9]

5.      On January 10, 2001, the Commission authorized Consumers Energy to transfer ownership of its transmission assets, including the subject interconnection facilities, to Michigan Electric.[10] In connection with the transfer, Consumers Energy requested Midland's consent to assign the Facilities Agreement to Michigan Electric.[11] However, because Consumers Energy was not proposing to assign its rights and obligations under the Power Purchase Agreement, Midland withheld its consent to assignment of the Facilities Agreement.[12] As a result, on April 1, 2001, the effective date of the asset transfer, Consumers Energy and Michigan Electric entered into the Agency Agreement, pursuant to which Consumers Energy delegated to Michigan Electric, i.e., authorized Michigan Electric to act as its agent, in carrying out its operations and maintenance (O&M) responsibilities under the Facilities Agreement with respect to the interconnection facilities transferred to Michigan Electric.

---

[8] The Facilities Agreement was amended on June 9, 2008, and May 28, 2009.

[9] The reimbursement obligations are set forth in sections 3.1 and 3.4 of the Facilities Agreement.

[10] *See Consumers Energy Co.*, *et al.,* 94 FERC ¶ 61,018 (2001). Michigan Electric, originally a subsidiary of Consumers Energy, became an independent transmission company in May 2002 when it was bought by Trans Elect Development Company, LLC. *See Trans-Elect, Inc.*, 98 FERC ¶ 61,142 (2002). Since 2006, Michigan Electric has been a subsidiary of ITC Holdings Corporation. *See ITC Holdings Corp.*, *et al.,* 116 FERC ¶ 61,271 (2006).

[11] Petition at 7.

[12] Midland, Motion to Intervene, Docket No. ER10-2156-000 (filed August 27, 2010).

Docket No. EL11-2-000                                                           - 4 -

6.      Michigan Electric states that, beginning in 2001, Midland reimbursed the costs (including property taxes) incurred by Michigan Electric, acting as Consumers Energy's agent, in carrying out Consumers Energy's duties under the Facilities Agreement, but that, beginning in November 2004, Midland ceased making any further payments. Michigan Electric states that the unpaid balance of the amounts due under the Facilities Agreement is $1,703,886.73.[13]  Notwithstanding, Michigan Electric states that it has continued to discharge its obligations, as Consumers Energy's agent, to provide Midland with interconnection services in accordance with the terms of the Facilities Agreement.[14]

7.      In July 2010, Midwest Independent Transmission System Operator, Inc. (MISO) filed a partially executed generator interconnection agreement (GIA) in Docket No. ER10-1814-000 among itself, as transmission provider, Michigan Electric, as transmission owner, and Midland, as interconnection customer.  The new GIA was prompted by Midland's request to increase the electrical output of the Midland Plant. MISO determined that the increase would require Midland to execute a new GIA and to terminate or amend the Facilities Agreement so as to avoid conflicting provisions concerning interconnection service.  Midland did not execute the new GIA because of its disagreement with certain of its terms.  In addition, Midland intervened in Docket No. ER10-1814-000 and protested MISO's assertion that the Facilities Agreement must be either terminated or amended.[15]  On August 6, 2010, Consumers Energy filed the Facilities Agreement in Docket No. ER10-2156-000.  In the Facilities Agreement Order, the Commission conditionally accepted the new GIA (in Docket No. ER10-1814-000) and accepted the late-filed Facilities Agreement, effective October 5, 2010 (in Docket No. ER10-2156-000).[16]  In the Facilities Agreement Rehearing Order, we are denying

---

[13] Petition at 7-8.

[14] *Id.* at 3.

[15] *Id.* at 10-11.

[16] In accordance with the Facilities Agreement Order, on November 16, 2010, MISO filed compliance revisions to the new GIA.  The revised GIA was accepted under delegated authority in *Midwest Transmission Sys. Operator, Inc*., Docket No. ER11-2137-000 (Jan. 28, 2011) (delegated letter order).  On June 9, 2011, MISO filed an Amended and Restated Generator Interconnection Agreement (Amended and Restated GIA) in Docket No. ER11-3764-000.  The Amended and Restated GIA is executed by MISO, Midland and Michigan Electric.  MISO sought a proposed effective date of June 10, 2011.  The filing was accepted pursuant to delegated authority, on July 20, 2011, in an unpublished letter order.  According to the filing, the Amended and Restated GIA will not become effective for purposes of governing interconnection service to the Midland

(continued...)

Docket No. EL11-2-000                                                          - 5 -

Consumer Energy's rehearing request and granting certain clarifications requested by Michigan Electric.

8.      On January 10, 2010, Michigan Electric filed suit against Midland in state court for the unreimbursed costs that it had incurred, as agent, in carrying out Consumers Energy's O&M obligations under the Facilities Agreement.[17]  Midland removed the proceeding to the District Court, invoking the court's jurisdiction over federal question subject matter,[18] i.e., rates of public utilities under the Federal Power Act (FPA).[19] Midland then filed a motion to dismiss the case, arguing, *inter alia*, that Michigan Electric's claims are barred by the filed rate doctrine since neither the Facilities Agreement nor the Agency Agreement had, at that time, been filed with the Commission.[20]

9.      On August 25, 2010 – by which time Consumers Energy had filed the Facilities Agreement with the Commission – the District Court denied Midland's motion to dismiss.[21]  In denying Midland's motion, the court raised various questions concerning how late-filing of the Facilities Agreement, and the Commission's acceptance of the filing, would affect resolution of the case.[22]  The District Court suggested that the

---

Plant until the Facilities Agreement between Midland and Consumers Energy is amended or terminated and the new metering configuration specified under the Amended and Restated GIA is put into place.  On November 15, 2011, Consumers Energy filed a Notice of Cancellation of the Facilities Agreement in Docket No. ER12-420-000.  That filing, which does not address the status of the Agency Agreement, is pending.

[17] Petition at 8.

[18] *See* 28 U.S.C. §§ 1331, 1441 (2006).

[19] 16 U.S.C. § 824 *et seq*. (2006).

[20] The filed rate doctrine "forbids a regulated entity [from charging] rates for its services other than those properly filed with the appropriate federal regulatory authority." *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577 (1981) (*Arkla v. Hall*).

[21] *Michigan Elec. Transmission Co. v. Midland Cogeneration Venture, L.P.*, No. 10-10661-BC (E.D. Mich. Aug. 25, 2010).

[22] The Facilities Agreement, which was originally executed on July 8, 1988, was not filed with the Commission until August 6, 2010.

20120330-3011 FERC PDF (Unofficial) 03/30/2012

Docket No. EL11-2-000                                                                - 6 -

Commission had exclusive jurisdiction over the rate matters at issue.[23]  The court also suggested that, even if the Commission did not have exclusive jurisdiction over the matters raised by the dispute, the matters might be better addressed by the Commission. On September 8, 2010, Michigan Electric asked the District Court to hold its proceedings in abeyance pending this Commission's resolution of the issues addressed in the then-pending Facilities Agreement proceeding and in the petition for declaratory order that Michigan Electric shortly thereafter filed in the instant docket.

10.    Subsequently, in the Facilities Agreement Order, the Commission noted that Consumers Energy's filing of the Facilities Agreement did not relieve Michigan Electric of its obligation to file the Agency Agreement.[24]  Accordingly, on October 18, 2010, Michigan Electric filed the Agency Agreement in Docket No. ER11-136-000, together with the Petition in this docket.  On December 17, 2010, in the Agency Agreement Order, the Commission accepted the Agency Agreement, effective December 17, 2010.[25]

II.    **Notice and Responsive Pleadings**

11.    Notice of Michigan Electric's Petition was published in the *Federal Register*, 75 Fed. Reg. 66,083 (2010), with protests and interventions due on or before November 17, 2010.  Consumers Energy filed a motion to intervene.  On November 8, 2010, Midland filed a motion to intervene and protest (Protest) in both this proceeding and the Agency Agreement proceeding.  On November 23, 2010, Michigan Electric filed an answer to Midland's Protest, and, on December 8, 2010, Midland filed a reply to Michigan Electric's answer.

III.    **Parties' Pleadings**

    A.    **Michigan Electric's Petition**

12.    Michigan Electric asks the Commission to find that Midland owes it $1,703,886.78 as reimbursement for costs (including property taxes) incurred in providing O&M services under the Facilities Agreement, plus interest on the past-due amounts calculated at the rate provided in the agreement.

---

[23] Petition at 3-4.

[24] Facilities Agreement Order, 132 FERC ¶ 61,241 at P 27.

[25] *See* Agency Agreement Order, 133 FERC ¶ 61,238 at P 8.

Docket No. EL11-2-000                                                    - 7 -

13.      Michigan Electric also asks the Commission to find that the late filing of both the Facilities Agreement and the Agency Agreement does not render those agreements null and void.  Michigan Electric argues that, under the Commission's holding in *Central Maine Power Company*[26] and the Commission's *Prior Notice Order,*[27] when a utility has charged an otherwise just and reasonable rate under a jurisdictional agreement, the agreement does not lose its full force and effect merely because it was not filed before service commenced.  In such cases, the utility is only required to return the time-value of revenues received before the agreement was filed.[28]  In this connection, Michigan Electric notes that Midland has argued that the Facilities Agreement should continue to have force, at least to the extent that Midland benefits from its terms, thereby implicitly acknowledging that a utility's failure to file an agreement prior to commencement of service does not invalidate the parties' obligations, including, in Michigan Electric's view, Midland's payment obligations to Michigan Electric.[29]

14.      Lastly, Michigan Electric asks the Commission to find that Michigan Electric's sole obligation resulting from the late filing of the Agency Agreement is to make time-value payments to Consumers Energy for the $500 per month agency fee that Consumers Energy paid Michigan Electric before the Agency Agreement was filed.[30]  Michigan Electric states that Midland is due no time-value payments that would offset Midland's obligations to Michigan Electric.  Michigan Electric cites the Commission's policy that the time-value remedy is itself limited so that the utility performing the jurisdictional service does not suffer a loss and recovers at least its variable costs and claims that the Facilities Agreement provides only for the recovery of variable costs.[31]

---

[26] 56 FERC ¶ 61,200, *reh'g denied*, 57 FERC ¶ 61,083 (1991).

[27] *Prior Notice and Filing Requirements Under Part II of the Federal Power Act*, 64 FERC ¶ 61,139, *order on reh'g*, 65 FERC ¶ 61,081 (1993) (*Prior Notice Order*).

[28] *Prior Notice Order*, 64 FERC ¶ 61,139 at 61,980.

[29] Petition at 22 & n.103 (citing Midland, Motion to Intervene and Protest in Docket No. ER10-1814-000 at 7 (filed August 9, 2010)).

[30] Petition at 16, 22.  As required by the terms of the Agency Agreement Order, Michigan Electric reimbursed Consumers Energy $15,042, representing the time value of the $500 per month agency fee it received prior to the effective date of the Agency Agreement and, on March 15, 2011, filed a refund report in Docket No. ER11-136-002.

[31] Petition at 21-22 & nn.104-05 (citing *Southern California Edison Co.*, 98 FERC ¶ 61,304 (2002); *Fla. Power & Light Co.*, 98 FERC ¶ 61,276, *reh'g denied*, 99 FERC

(continued...)

Docket No. EL11-2-000                                                    - 8 -

### B.    Midland's Protest

15.    In its Protest, Midland argues that it has no contract with Michigan Electric and that the rates Michigan Electric is seeking to recover through the Agency Agreement are not just and reasonable.  On the contrary, Midland maintains that Michigan Electric should be ordered to refund approximately $6.2 million that Midland paid over the last several years to replace, maintain, and upgrade transmission assets belonging to Michigan Electric.[32]

16.    Midland recounts that, under the Facilities Agreement, it agreed to pay the costs of connecting the Midland Plant to Consumers Energy's transmission grid.  It paid $16 million to construct the transmission equipment and necessary network upgrades, with ownership of all network facilities vesting in Consumers Energy.  Midland states that the Facilities Agreement also requires it to maintain and replace, if necessary, the transmission facilities and to pay all costs of operating and maintaining the interconnection facilities.  Midland states that, for three years following Consumers Energy's transfer of its transmission assets to Michigan Electric, Midland mistakenly paid invoices submitted by Consumers Energy that turned out to be for Michigan Electric's benefit, and made one direct payment to Michigan Electric for 2003 taxes.  However, according to Midland, beginning in late 2004, once it realized that these payments were being made, it ordered a cessation of further direct or indirect payments to Michigan Electric.[33]  Midland states that its refusal to pay was based on the alleged violation of the anti-assignment clause of the Facilities Agreement and Michigan Electric's refusal to enter into a new interconnection agreement.[34]

17.    Midland states that, when Michigan Electric filed the Agency Agreement, Michigan Electric asked the Commission to accept the agreement as just and reasonable, but Michigan Electric's Petition nowhere addresses the justness and reasonableness of the Agency Agreement's charges, despite Michigan Electric bearing the burden of establishing the reasonableness of the charges under section 205 of the FPA.[35]  Midland

---

¶ 61,320 (2002); *Carolina Power and Light Co.*, 84 FERC ¶ 61,103, at 61,522 (1998), *order on reh'g*, 87 FERC ¶ 61,083, at 61,357 (1999)).

[32] Protest at 8, 10.

[33] *Id.* at 4-5.

[34] *Id.* at 21.

[35] 16 U.S.C. § 824d (2006).

objects to Michigan Electric's assumption that the charges for which it seeks reimbursement are just and reasonable. It argues that, despite the characterization of the charges at issue as reimbursement, they are unjust and unreasonable because they violate three Commission policies: (1) the prohibition against direct assignment of network costs to individual interconnection customers; (2) the prohibition in Order No. 2003[36] on transmission providers looking to interconnection customers to pay property taxes on the providers' transmission equipment;[37] and (3) the prohibition on double recovery.[38]

18.     Midland argues that, even if the Commission were to find that Michigan Electric's charges are just and reasonable, Michigan Electric would have no right to collect them retroactively because courts and the Commission have limited the circumstances under which late-filed jurisdictional agreements are given retroactive effect and, in any case, in the Facilities Agreement Order, the Commission denied Michigan Electric's request that the Facilities Agreement be accepted with a retroactive effective date. Moreover, according to Midland, in its motion for clarification of the Facilities Agreement Order and in its Petition in this proceeding, Michigan Electric has shifted its position and is now arguing that the effective date of the Agency Agreement and Facilities Agreement is irrelevant and that acceptance of those filings has mooted any argument that the Facilities and Agency Agreements are invalid due to late filing, the only question being the appropriate remedy for the late filing. Midland argues that the filed rate doctrine prevents Michigan Electric from collecting the rates provided for in the Facilities Agreement. Midland also argues that the Commission has repudiated the notion that unfiled rates are enforceable even if reflected in a consensual bilateral contract. In this regard, Midland asserts that this case is distinguishable from cases in which the Commission applied its *Prior Notice* policy of allowing the collection of unfiled rates

---

[36] *Standardization of Generator Interconnection Agreements and Procedures,* Order No. 2003, FERC Stats. & Regs. ¶ 31,146 (2003), *order on reh'g,* Order No. 2003-A, FERC Stats. & Regs. ¶ 31,160, *order on reh'g,* Order No. 2003-B, FERC Stats. & Regs. ¶ 31,171 (2004), *order on reh'g,* Order No. 2003-C, FERC Stats. & Regs. ¶ 31,190 (2005), *aff'd sub nom. Nat'l Ass'n of Regulatory Util. Comm'rs v. FERC*, 475 F3d. 1277 (D.C. Cir. 2007), *cert. denied*, 552 U.S. 1230 (2008).

[37] "The Commission rejects the proposal that ad valorem property taxes be included in the Interconnection Customer's obligation to reimburse the Transmission Provider for taxes, since these expenses are annual and are more analogous to operating expenses that are not covered under the LGIA." Order No. 2003, FERC Stats. & Regs. ¶ 31,146 at P 444.

[38] Protest at 11. .

Docket No. EL11-2-000                                                  - 10 -

contained in a consensual bilateral contract prior to the effective date of the tariff. Midland argues that the Commission's *Prior Notice* policy does not apply where, as here, the entity receiving service pursuant to an unfiled contract has refused to pay for that service, and the provider of that service did not seek to compel payment for the service.[39]

## IV.    Discussion

### A.    Procedural Matters

19.    Under Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (2011), the timely, unopposed motions to intervene serve to make Consumers Energy and Midland parties to this proceeding. Rule 213(a)(2) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.213(a) (2011), prohibits an answer to a protest or an answer unless otherwise ordered by the decisional authority. We are not persuaded to accept Michigan Electric's answer or Midland's reply to Michigan Electric's answer.

### B.    Substantive Determinations

20.    As we explain in the Facilities Agreement Rehearing Order that is being issue concurrently with this order, the failure of the parties to timely file the Facilities Agreement and the Agency Agreement does not affect their validity and enforceability during the period before they were filed, and nothing in the Facilities Agreement Order was intended to, or did, modify the Commission's policy regarding late-filed agreements. Thus, Consumers Energy is entitled to recover the rates authorized in the Facilities Agreement for the entire period that the Facilities Agreement has been jurisdictional, and Midland is likewise obligated to reimburse Consumers Energy for the costs (including property taxes) properly incurred under the Facilities Agreement to provide the O&M services.

21.    Since we have already, in the Facilities Agreement Rehearing Order, addressed the respective obligations of Midland and Consumers Energy under the Facilities Agreement

---

[39] *Id.* at 21-22. We note that, in its Protest (at 10, 23), as well as in its January 6, 2011 protest filed in connection with Consumers Energy's December 12, 2010 refund report filed in Docket No. ER10-2156-002, Midland also argues that personal property taxes assessed on the interconnection facilities, which represent most of the $1.7 million that Michigan Electric seeks from Midland, are a fixed (or annual), rather than variable, cost and, as such, are not subject to the Commission's *Prior Notice* policy. We will address this issue in our order on Consumers Energy's refund report, which was revised in a filing on October 28, 2011, in Docket No. ER10-2156-002.

Docket No. EL11-2-000                                                           - 11 -

with regard to the past due amounts, and granted clarification concerning the effect of late filing of the two agreements, it is unnecessary to grant the specific relief that Michigan Electric seeks in the Petition, specifically, an order directing Midland to make payment directly to Michigan Electric. Moreover, since Midland and Michigan Electric are not both parties to any agreement, it is unclear what the contractual basis would be for any such order.[40]

22.      In its Protest, Midland argues that the filed-rate doctrine bars the Commission from requiring Midland to pay for interconnection services received prior to the filing of the Facilities Agreement. We disagree. In *Arkla v. Hall*, the Supreme Court explained that, while Congress has withheld the authority to grant retroactive rate increases or to permit the collection of a rate other than the one on file, the Commission may grant a waiver of the requirement to timely file rates.[41] In the *Prior Notice Order,* the Commission stated that it generally would deny a waiver of the prior notice requirement in cases where a jurisdictional agreement was late-filed, but the Commission also stated that it would allow late-filed agreements to be effective from the time they were jurisdictional (with a time-value remedy for the late filing).[42] As we explain in the Facilities Agreement Rehearing Order, we see nothing that prevents application of our *Prior Notice Order* to the current dispute; nor is there anything that precludes the Commission's acceptance of the rates contained in the Facilities Agreement despite the late filing of those rates.

23.      We are not persuaded by Midland's attempt to distinguish the present case from those in which the Commission has applied its *Prior Notice* policy to allow the collection of unfiled rates contained in consensual bilateral contracts prior to the effective date. Essentially, while Midland took the service provided, Midland argues that it should not have to pay for that service; i.e., Midland argues that the Commission should not apply its *Prior Notice* policy where, as here, Midland refused to make payments under the Facilities Agreement due to the alleged violation of the anti-assignment clause in the agreement. However, Midland has not filed any complaint against Consumers Energy

---

[40] In this regard, as we note in the Facilities Agreement Rehearing Order, the Agency Agreement contemplates that Consumers Energy and Michigan Electric will cooperate on billing and collection matters.

[41] *See Arkla v. Hall*, 453 U.S. at 577 (explaining both the Commission's exclusive role in setting rates and the filed-rate doctrine).

[42] *Prior Notice Order*, 64 FERC ¶ 61,139 at 61,979. *See also El Paso Elec. Co.*, 105 FERC ¶ 61,131, at P 32 (2003).

Docket No. EL11-2-000                                          - 12 -

based on the alleged contract violation, and Consumers Energy has not sought to disclaim its continuing obligation to perform under the Facilities Agreement. Moreover, while Midland has refused to make payments, Midland continues to accept performance from Michigan Electric, as agent for Consumers Energy.

24.     Similarly, Midland's argument that the rates contained in the Facilities Agreement are inconsistent with Order No. 2003 is misplaced given the Commission's acceptance of the rates set forth in the Facilities Agreement and Midland's failure to seek rehearing of the Facilities Agreement Order.

25.     Finally, if Midland is correct in its claim that Michigan Electric is already recovering the O&M costs (including property taxes) associated with the interconnection facilities from its other customers, such that recovery from Midland would result in double recovery, its only recourse is to file a complaint pursuant to section 206 of the FPA seeking modification to the rates in the Facilities Agreement or Michigan Electric's formula rate in Attachment O of MISO's tariff,[43] or by challenging implementation of Michigan Electric's formula rate through Michigan Electric's Attachment O protocols. Otherwise, Midland must comply with the terms and conditions of its Facilities Agreement.

The Commission orders:

    Michigan Electric's Petition is hereby granted in part and denied in part.

By the Commission.

(S E A L)

                            Nathaniel J. Davis, Sr.,
                            Deputy Secretary.

--------------------------

    [43] 16 U.S.C. § 824e (2006).

## APPENDIX B

| | |
|---|---|
| **Midland Cogeneration Venture Limited Partnership**<br>Gordon A. Coffee<br>Winston & Strawn LLP<br>1700 K Street, NW<br>Washington, DC 20006<br>*gcoffee@winston.com* | **Midland Cogeneration Venture Limited Partnership**<br>Charles E. Dunn<br>Corporate Counsel and Secretary<br>100 Progress Place<br>Midland, MI 48640<br>*CEDunn@midcogen.com* |
| **Midland Cogeneration Venture Limited Partnership**<br>Raymond B. Wuslich<br>Winston & Strawn LLP<br>1700 K Street, NW<br>Washington, DC 20006<br>*rwuslich@winston.com* | **Midland Cogeneration Venture Limited Partnership**<br>Erica E. Stauffer<br>Winston & Strawn LLP<br>1700 K Street, NW<br>Washington, DC 20006<br>*estauffer@winston.com* |
| **FERC**<br>Robert H. Solomon<br>Solicitor<br>Room: 9A-01<br>Federal Energy Regulatory Commission<br>888 First Street NE<br>Washington, DC 20426<br>*robert.solomon@ferc.gov* | **FERC**<br>Kimberly Bose<br>Secretary<br>Room: 1A<br>Federal Energy Regulatory Commission<br>888 First Street NE<br>Washington, DC 20426<br>*kimberly.bose@ferc.gov* |
| **Michigan Electric Transmission Company, LLC**<br>Thomas Wrenbeck<br>Director, Regulatory Strategy<br>ITC Holdings Corp.<br>27175 Energy Way<br>Novi, MI 48377<br>*twrenbeck@itctransco.com* | **Michigan Electric Transmission Company, LLC**<br>James Bixby<br>Attorney - Regulatory & Legislative<br>ITC Holdings Corp.<br>1300 I St., NW<br>Washington, DC 20005<br>*jbixby@itctransco.com* |

| | |
|---|---|
| **Michigan Electric Transmission Company, LLC**<br>James Frankowski<br>ITC Holdings Corp.<br>27175 Energy Way<br>Novi, MI 48377<br>*jfrankowski@itctransco.com* | **Michigan Electric Transmission Company, LLC**<br>John Staffier<br>Stuntz, Davis & Staffier, P.C.<br>555 Twelfth St., NW<br>Suite 630<br>Washington, DC 20004<br>*jstaffier@sdsatty.com* |
| **Consumers Energy Company**<br>James Roush<br>Principal Attorney<br>One Energy Plaza<br>EP11-238<br>Jackson, MI 49201<br>*James.roush@cmsenergy.com* | **Midwest Independent Transmission System Operator, Inc.**<br>Matthew Dorsett<br>720 City Center Drive<br>Carmel, IN 46032<br>*mdorsett@misoenergy.org* |

# APPENDIX C

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| MIDLAND COGENERATION VENTURE LIMITED PARTNERSHIP | ) ) ) |
| Petitioner, | ) ) |
| v. | ) Case No. 14-_____ |
| | ) |
| FEDERAL ENERGY REGULATORY COMMISSION | ) ) ) |
| Respondent. | ) |

## CORPORATE DISCLOSURE STATEMENT OF
## MIDLAND COGENERATION VENTURE LIMITED PARTNERSHIP

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, the undersigned counsel for Petitioner hereby certifies as follows:

Midland Cogeneration Venture Limited Partnership ("Midland") is a privately-owned Michigan limited partnership. It is the owner/operator of a combined-cycle natural gas-fired cogeneration facility located in Michigan, from which Midland generates and sells electric energy. The facility is a Qualifying Facility pursuant to the Federal Energy Regulatory Commission's regulations.

Since September 2013, Midland has been indirectly owned by BPC Power Generation Corporation, Green Bridge Sparta Partners L.P., and Babaski Gate LLC. These companies own and control Midland through a series of intermediary companies.[1]

There is no publicly-held company that has a 10 percent or greater ownership interest in Midland. Throughout the agency proceedings under review, Midland has been represented by Winston & Strawn LLP.

Respectfully submitted,

Gordon A. Coffee
Raymond B. Wuslich
Winston & Strawn LLP
1700 K Street, N.W.
Washington, D.C. 20006
Tel: (202) 282-5000
Fax: (202) 282-5100
E-mail: rwuslich@winston.com

ATTORNEYS FOR
MIDLAND COGENERATION VENTURE
LIMITED PARTNERSHIP

Dated: February 7, 2014

---

[1] The intermediary entities are: MCV GP Acquisition Company LLC; Chippewa Acquisition Company LLC; MCV Holding Company LLC; Progress Place Acquisition Company Inc.; and Sparta Acquisition Corporation. BPC Power Generation Corporation is owned by OMERS Administration Corporation, a Canadian statutory corporation that is the administrator of one of Canada's leading pension funds.